RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0122P (6th Cir.)
File Name: 02a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THE LIMITED, INC., and
consolidated subsidiaries,
          *Petitioner-Appellant,*

          *v.*

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 00-2245

On Appeal from the United States Tax Court.
No. 95-26618—James S. Halpern, Tax Court Judge.

Argued: January 25, 2002

Decided and Filed: April 11, 2002

Before: JONES,[*] DAUGHTREY, and COLE, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Roger J. Jones, MAYER, BROWN & PLATT,
Chicago, Illinois, for Appellant. Teresa E. McLaughlin,

_____
[*] This opinion was submitted to the court prior to Judge Nathaniel R.
Jones' departure from the court effective March 31, 2002.

1

UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.  **ON BRIEF:**  Roger J. Jones, Joel V. Williamson, Russell R. Young, MAYER, BROWN & PLATT, Chicago, Illinois, James P. Fuller, Jennifer L. Fuller, Kenneth B. Clark, William F. Colgin, FENWICK & WEST, Palo Alto, California,  for Appellant. Teresa E. McLaughlin, Donald B. Tobin, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.   Stephen D. Gardner, KRONISH, LIEB, WEINER & HELLMAN, New York, New York, for Amicus Curiae.

––––––––––––––––––

## OPINION

––––––––––––––––––

   R. GUY COLE, JR., Circuit Judge.  Petitioner-appellant, The Limited, Inc. ("Taxpayer"), is one of the largest specialty retailers in the United States.  As the common parent of a group of affiliated corporations, Taxpayer filed a consolidated income tax return for the taxable year ending on January 30, 1993 (the "1993 Tax Year").  The Commissioner of Internal Revenue informed Taxpayer of several deficiencies in its federal income tax returns for two tax years, including the 1993 Tax Year.  Taxpayer and the Commissioner settled all of their differences except for a dispute regarding Taxpayer's subsidiary credit card company's sale of $174.9 million in certificates of deposit to a subsidiary of one of Taxpayer's controlled foreign corporations.  In a two-step decision, the Tax Court concluded that Taxpayer should have recognized the purchase of $174.9 million in certificates of deposit as a taxable investment in "United States property" under I.R.C. §§ 951 and 956.   First, the Tax Court held that the § 956(b)(2)(A) exception to the definition of "United States property" for "deposits with persons carrying on the banking business" does not apply because the subsidiary credit card company did not carry on the banking business.  Second, and

Court cannot stand, and we need not consider the Regulation Issue. Therefore, we **REVERSE** the judgment of the Tax Court.

equally vital to its judgment, the Tax Court held that under temporary regulation § 1.956-1T, the $174.9 million in certificates of deposit should have been attributed to Taxpayer's controlled foreign corporation because the principal purpose for the creation, organization, or funding of the controlled foreign corporation's subsidiary was to avoid the application of § 956. Taxpayer appealed both grounds for the Tax Court's decision. The Tax Court erred in its analysis of § 956, and on that basis, we reverse its judgment.

## I.

The disputed transaction was a January 28, 1993 wire-exchange of cash for interest-bearing certificates of deposit (the "January 28 Transfer"). Three of Taxpayer's subsidiaries were involved in the January 28 Transfer: Mast Industries (Far East), Ltd. ("MFE"), MFE (Netherlands Antilles) N.V. ("MFE-NV"), and the World Financial Network National Bank ("WFNNB").

### MFE

MFE is a Hong Kong corporation that operates throughout Asia, manufacturing or obtaining garments for sale in Taxpayer's stores. MFE is a third-tier subsidiary of Taxpayer, and under I.R.C. § 957(a), MFE constitutes a controlled foreign corporation (a "CFC") of Taxpayer. For several years before the close of the 1993 Tax Year, MFE had accumulated and not distributed approximately $330 million in earnings and profits.

### MFE-NV

MFE-NV is a Netherlands Antilles corporation created in January 1993, at the end of the 1993 Tax Year. MFE-NV is a fourth-tier subsidiary of Taxpayer and is wholly owned by MFE. Its corporate purposes include "engaging in group financing activities and providing for a means of investing and reinvesting liquid assets and funds." Consistent with

those purposes, shortly after it was created, MFE-NV received a $175 million capital contribution from MFE.

### WFNNB

WFNNB is a credit card company that issues credit cards to customers of Taxpayer's stores. Taxpayer wholly owns WFNNB. As a condition of being owned by a non-bank, WFNNB complies with 12 U.S.C. § 1841(c)(2)(F), which requires that it (i) engage in only credit card operations; (ii) not accept demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others; (iii) not accept any savings or time deposit of less than $100,000; (iv) maintain no more than one office that accepts deposits; and (v) not engage in the business of making commercial loans. WFNNB is also a nationally chartered bank, authorized to carry on the business of banking under the laws of the United States. Consequently, WFNNB is regulated by the Office of the Comptroller of Currency, the Federal Deposit Insurance Company, and the Board of Governors of the Federal Reserve.

### The January 28, 1993 Transfers

The January 28 Transfer was a two-part transaction between MFE, MFE-NV, and WFNNB. In the first part, MFE wired $175 million to MFE-NV. In the second part, MFE-NV used $174.9 million to purchase eight certificates of deposit with an annual yield of 3.14% (the "CDs") from WFNNB.

Taxpayer explained that the sole reason for this transaction was to protect MFE's assets from seizure by the People's Republic of China. Taxpayer believed that because Hong Kong was scheduled to return to China in 1997, China would begin to expropriate all assets in Hong Kong corporations on or before that date. To prevent the expropriation of MFE's assets, MFE created MFE-NV to hold MFE's assets and to act as a layer of protection from asset seizure. As a further shield

support of this argument the Commissioner references several aspects of the January 28 Transfer that would have discouraged independent parties: WFNNB's assets and equity were too small in relation to the amount of the CDs; WFNNB would not have been able to raise large amounts of private funds because it had no commercial customers or any branch network; as a credit card company for Taxpayer's retail stores, WFNNB was forced to accept large numbers of small outstanding balances, which stunted its loan quality and its lines of credit; WFNNB carried off-balance sheet credit card liabilities of almost eight times its total assets; and the 3.1% interest rate was below the market rate. With those facts in mind, the Commissioner urges us to apply the step-transaction doctrine. Through that approach of examining each step of the January 28 Transfer, the Commissioner contends that the January 28 Transfer is a taxable repatriation of offshore MFE profits and not a "deposit."

While the Commissioner's arguments all support the conclusion that it is improbable that the January 28 Transfer would have occurred between unrelated parties, that argument is tangential to the question of whether the CDs that MFE-NV purchased from WFNNB were "deposits" under § 956(b)(2)(A). Thus, the question of whether independent parties would have engaged in the January 28 Transfer is not the issue here. Rather, the question is whether the CDs, i.e., the certificates of *deposit*, that MFE-NV purchased from WFNNB constituted "deposits." Because the term "deposit" is not defined for purposes of § 956(b)(2)(A), we look to its ordinary meaning. Rather than belabor this point with dictionary definitions, we think that it is sufficiently clear that a certificate of *deposit* constitutes a "deposit" absent a specialized definition of "deposit." For that reason, we reject the Commissioner's final argument on the § 956 Issue as well.

### III.

In short, The Tax Court erred in its determination of the § 956 Issue. On that basis alone, the judgment of the Tax

§ 1841(c)(2)(F) limitations on WFNNB's banking activities, WFNNB is not a full-service bank, and, therefore, should not be viewed as "carrying on the banking business" under § 956(b)(2)(A).

That argument should not prevail. If we were to adopt that reasoning, then any non-full-service bank would be excluded from "carrying on the banking business." Moreover, if we were to abide strictly by the § 1841(c)(2) definitions, then United States branches of foreign banks, federal savings associations, and federal savings banks would not be considered banks. *See* 12 U.S.C. § 1841(c)(2)(A)-(B); *see also* 12 U.S.C. § 1841(j). Under that reading, CFC deposits with United States branches of foreign banks, federal savings associations, and federal savings banks would likewise not qualify as exceptions to "United States property," and would be taxable. By excluding those entities, the Commissioner's proposed application of § 1841(c)(2)(F) conflicts too greatly with an ordinary and normal understanding of what it means to be "carrying on the banking business."

In short, because there is no legal basis for applying the 12 U.S.C. § 1841(c)(2)(F) exclusion here and because doing so conflicts with an ordinary and normal reading of the phrase "the banking business," the exclusion should not control the phrase "the banking business" as used in I.R.C. § 956(b)(2)(A).

### c.   The Certificates of Deposit Are "Deposits" under § 956(b)(2)(A).

The last argument that the Commissioner raises against the application of § 956(b)(2)(A) is that the CDs that MFE-NV purchased from WFNNB were not "deposits" within the meaning of the phrase "deposits with persons carrying on the banking business." The Commissioner argues that because the transfer of CDs never would have taken place on the open market between independent parties, it should not be permitted to qualify as a "deposit" under § 956(b)(2)(A). In

against the asset expropriation, MFE-NV purchased CDs from WFNNB with $174.9 million that it received from MFE.

While this transfer may have been a good means of removing assets from Hong Kong (and funding WFNNB), it now presents a difficult international tax question. Taxpayer claimed that MFE-NV's purchase of $174.9 million in CDs from WFNNB did not constitute taxable "United States property" under § 956 and thus Taxpayer did not report § 951(a)(1)(B) taxes. Taxpayer argued that the CDs amounted to "deposits with persons carrying on the banking business," which is an exception to "United States property" under § 956(b)(2)(A). The Commissioner disagreed. The Commissioner believed that MFE-NV's purchase of the CDs did not qualify under the § 956(b)(2)(A) exception and therefore was an investment in "United States property" that was taxable under Subpart F of the Internal Revenue Code (I.R.C. §§ 951-64). Consequently, the Commissioner issued a notice of deficiency to Taxpayer. The Commissioner and Taxpayer could not resolve this issue and finally it was litigated before the Tax Court.

### The Two Underlying Tax Issues

Two conclusions are necessary to sustain the Commissioner's finding of a tax deficiency: (1) that MFE-NV's purchase of CDs was not a deposit with persons carrying on the banking business under § 956(b)(2)(A) (the "§ 956 Issue") and (2) that under temporary regulation § 1.956-1T, the principal purpose for creating, organizing, or funding MFE-NV was to avoid the application of § 956 (the "Regulation Issue").

The first conclusion is necessary to sustain the deficiency because Subpart F of the Internal Revenue Code generally taxes CFCs when they invest their earnings in "United States property." *See* I.R.C. § 951(a)(1)(B). However, Section 956(b)(2)(A) excludes "deposits with persons carrying on the banking business" from the definition of "United States

property." I.R.C. § 956(b)(2)(A). Thus, if MFE-NV's purchase of CDs from WFNNB is not a "deposit with persons carrying on the banking business," then it is an investment in "United States property."

The second conclusion – that the CDs should be attributed to MFE and recognized as income by the Taxpayer under § 951(a)(1)(B) – is also necessary to sustain the deficiency. Section 951(a), which taxes the income of CFCs, does not normally apply to an entity such as MFE-NV, which is a wholly-owned subsidiary of a CFC, and not a CFC itself. Consequently, even if MFE-NV had made investments in "United States property," that income would not have been subject to taxation. However, under temporary regulation § 1.956-1T, if the principal purpose for creating, organizing, or funding MFE-NV were to avoid the application of § 956, then the CDs that MFE-NV purchased would be attributed to MFE. If the CDs were attributed to MFE, which is a CFC, then, building off of the first conclusion, those CDs would be subject to taxation as part of MFE's earnings invested in "United States property."

Thus, for a deficiency to stand, the Commissioner must win the § 956 Issue and the Regulation Issue. The Tax Court resolved both issues in favor of the Commissioner and for that reason upheld the Commissioner's finding of a deficiency.

### The Tax Court's Treatment of the § 956 Issue

On the § 956 Issue, the Tax Court concluded that MFE-NV's purchase of CDs from WFNNB was not a "deposit with persons carrying on the banking business," and therefore did not constitute an investment in "United States property." The Tax Court interpreted the use of the definite article, "the," in the phrase "carrying on the banking business" as indicating "a purpose to particularize the activity." In deciding which particularized business activity Congress was referring to in § 956(b)(2)(A), the Tax Court relied on the language of the statute and legislative history. Based on those

banks. Thus, as the Tax Court did before us, we reject the Commissioner's argument that the § 581 definition of "bank" applies to the phrase "carrying on the banking business" in § 956(b)(2)(A).

**b. The 12 U.S.C. § 1841(c)(2)(F) Exception to the Definition of "Bank" Does Not Govern What Constitutes "the Banking Business" under I.R.C. § 956(b)(2)(A).**

In another attempt to salvage the Tax Court's ruling on the § 956 Issue, the Commissioner argues that because WFNNB complies with the 12 U.S.C. § 1841(c)(2)(F) restrictions, WFNNB does not carry on the banking business. Generally, non-banks cannot own banks, but non-banks can own credit card companies that comply with § 1841(c)(2)(F) because those credit card companies are excluded from the § 1841(c)(1) definition of "bank." *See* 12 U.S.C. § 1841(c)(2)(F). Relying on the fact that WFNNB is not a "bank" under § 1841(c)(2)(F), the Commissioner contends that WFNNB is not "carrying on the banking business." Essentially, through this argument, the Commissioner tries for a second time to import a definition of "bank" from elsewhere in the United States Code to control the phrase "the banking business" as used in I.R.C. § 956(b)(2)(A). The Commissioner fails in this attempt as well.

As with the I.R.C. § 581 definition of "bank," there is no statutory basis for applying the 12 U.S.C. § 1841(c)(2)(F) exclusion of "bank" to I.R.C. § 956(b)(2)(A). Congress created exceptions to the definition of "bank" in § 1841(c)(2)(F) only for purposes of Chapter 12 of the United States Code. *See* 12 U.S.C. § 1841(c). For that reason, the 12 U.S.C. § 1841(c)(2)(F) exclusion does not govern I.R.C. § 956(b)(2)(A).

Despite the lack of statutory authority for applying the § 1841(c)(2)(F) exclusion, the Commissioner urges us to apply it anyway. The Commissioner argues that in light of the

accord a revenue ruling any deference, where, as here, the revenue ruling fails to address the relevant issue on appeal.").

In light of these principles, Revenue Ruling 70-385 does not apply here. Revenue Ruling 70-385 contemplated a very different factual situation than the present case. In 70-385, the IRS considered the question of whether deposits with *foreign* financial institutions constituted "persons carrying on the banking business." *See* Rev. Rul. 70-385, 1970-2 C.B. 156. Because it was not clear under United States law whether the foreign financial institutions were "carrying on the banking business," the IRS applied the § 581 definition of "bank" to determine which foreign financial institutions fit the § 956(b)(2)(A) exception. *See id.* From the scope of 70-385, none of the hypothetical foreign financial institutions that the IRS considered had national bank charters, nor were they regulated by the Office of the Comptroller of Currency and the Federal Reserve, nor were they insured by the FDIC, as WFNNB is. Quite plainly, WFNNB is not one of the foreign financial institutions that the IRS contemplated when it issued 70-385. Thus, while 70-385 concludes that the § 581 definition of "bank" is helpful in determining whether foreign financial corporations are "carrying on the banking business," it provides no reason to extend its application to nationally chartered banks. Thus, the hypothetical question that the IRS answered in 70-385 is factually distinct from the present situation. For that reason, we do not expand 70-385 to apply to domestic financial institutions.

This conclusion is reinforced by a court's duty to interpret statutes in conformity with their plain language. As explained above, it makes little sense to stretch the ordinary meaning of an undefined term. Under an ordinary and normal reading, WFNNB, which engages in the business of banking, carries on "the banking business" for purposes of § 956(b)(2)(A). In this case, especially, we decline to extend the meaning of "the banking business" to impose a definition of "bank" that (1) Congress never expressly intended apply and (2) that the IRS never considered as applying to nationally chartered

sources, the Tax Court reasoned that the phrase, "the banking business," as used in § 956(b)(2)(A), applied only to deposits with banks offering banking services that facilitate the United States business activities of CFCs – the "business facilitation" rationale. Because WFNNB, as a credit card company, was restricted from engaging in business facilitation aspects of banking by 12 U.S.C. § 1841(c)(2)(F), the Tax Court concluded that MFE did not purchase CDs from "persons carrying on the banking business."

The Tax Court reaffirmed its conclusion on the § 956 Issue by reading a related-party exception into § 956(b)(2)(A). The Tax Court reasoned that in light of the dividend equivalence theory, a plain reading of § 956(b)(2)(A) would lead to an unreasonable result if the Taxpayer did not need to recognize income on the $174.9 million investment made between its subsidiaries. In general, under the dividend equivalence theory, United States shareholders of CFCs must include in their income the amount of "United States property" owned by the CFC. *See* S. REPT. NO. 87-1881 (1962); 1962 U.S.C.C.A.N. 3297, 3391 ("Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that this is substantially the equivalent of a dividend being paid to them."). The Tax Court interpreted the dividend equivalence theory as also treating a United States shareholder's use of a CFC's earnings as though those earnings were a taxable dividend. To avoid an unreasonable conflict with its understanding of the dividend equivalence theory, the Tax Court required that § 956(b)(2)(A) apply only to investments with an unrelated entity.

In short, by imposing the business-facilitation and the related-party conditions on the § 956(b)(2)(A) exception, the Tax Court held that MFE-NV's purchase of $174.9 million in CDs from WFNNB did not fit the § 956(b)(2)(A) exception to the definition of "United States property."

**The Tax Court's Treatment of the Regulation Issue**

In deciding the Regulation Issue, the Tax Court concluded that temporary regulation § 1.956-1T applied to the January 28 Transaction. Temporary regulation § 1.956-1T(b)(4) provides that a CFC indirectly holds investments in "United States property" where one of its subsidiaries makes investments in "United States property" and one of the principal purposes for creating, organizing, or funding the subsidiary was to avoid the application of § 956. As a finding of fact, the Tax Court concluded that a principal purpose behind the creation, organization, or funding of MFE-NV was to avoid the application of § 956. Taxpayer's witnesses stated that the sole reason behind the creation of MFE-NV was to shield MFE's assets from Chinese expropriation. But, the Tax Court did not believe Taxpayer's expropriation justification for the creation of MFE-NV. For the Tax Court, the smoking gun was the following portion of the cross-examination testimony of Timothy B. Lyons, Taxpayer's Vice President of Tax during the years in question:

Question:  Okay. Were there any – was there ever any consideration of – I take it there was no consideration given to the possibility of forming a domestic subsidiary of MFE.

Answer:  To do what?

Question:  To provide the extra layer of protection in ownership, in place of – rather than forming MFE N.V., was there any consideration given to forming MFE U.S.?

Answer:  It didn't really accomplish anything from the asset protection side because it was still an ownership of the – a Hong Kong subsidiary, *but, at the same time, then there is no question that it would have been deemed a dividend or something at that point.*

rulings. *Id*. Revenue rulings do not apply as broadly as regulations, nor as narrowly as private letter rulings. *See id.*; *see also True Oil Co. v. Comm'r of Internal Revenue*, 170 F.3d 1294, 1304 (10th Cir. 1999) (explaining that revenue rulings "do not have the same force and effect as treasury regulations and consequently are not binding on this court"). Rather, revenue rulings are typically the IRS's response to a hypothetical situation and as such are authoritative and binding on the IRS. *See Bankers Life*, 142 F.3d at 978 ("Revenue rulings typically contain the IRS's interpretation of how the law applies to a set of hypothetical facts. Revenue rulings do not have broad application like regulations, but the IRS does consider them authoritative and binding."). Although binding on the IRS, revenue rulings are interpretive rulings by an administrative agency that do not require notice and comment and consequently are not binding on courts. *See id.*; *see also Babin v. Comm'r of Internal Revenue,* 23 F.3d 1032, 1038 (6th Cir. 1994) ("Revenue rulings are not binding on this court."). Nevertheless, as the informed opinion of a specialized agency, this Circuit has treated revenue rulings as having persuasive authority. *See Babin*, 23 F.3d at 1038 ("[B]ecause revenue rulings express the studied view of the IRS, whose duty is to carry out the provisions of the Internal Revenue Code, they are entitled to some deference."); *Constantino v. TRW, Inc.*, 13 F.3d 969, 981 (6th Cir. 1994) ("Unlike the regulations, IRS rulings do not have the force of law and are merely persuasive authority."); *Kinnie v. United States*, 994 F.2d 279, 286 (6th Cir. 1993); *see also CenTra, Inc. v. United States*, 953 F.2d 1051, 1056 (6th Cir. 1992); *cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (refraining from deciding the level of deference due revenue rulings, but explaining that because the revenue rulings at issue reflected the IRS's longstanding interpretation of its own regulations, that interpretation "attracts substantial judicial deference"). However, because revenue rulings often provide the IRS's interpretation of a hypothetical set of facts, courts should not extend the scope of a revenue ruling beyond the hypothetical situation presented. *See Babin*, 23 F.3d at 1038 ("[W]e need not

reasons: (1) there is no statutory basis for applying the § 581 definition of "bank" to the § 956(b)(2)(A) exception; (2) Revenue Ruling 70-385 is not binding on this Court and is at best persuasive authority; and (3) given its scope, Revenue Ruling 70-385 does not apply here.

No statutory basis exists for applying the § 581 definition of "bank" to the § 956(b)(2)(A) exception. In its first sentence, § 581 expressly states that its definition of "bank" is "[f]or purposes of sections 582 and 584." I.R.C. § 581. With that restriction, it is clear that Congress was not providing a general definition of "bank," but rather a specialized definition that applied only to certain statutory sections.

Other sections of the Tax Code support this interpretation. At the time of the January 28 Transfer, several code sections had specifically adopted the § 581 definition of the word "bank." *See, e.g.,* I.R.C. § 165(*l*)(3)(A); I.R.C. § 246A(c)(3)(B)(i); I.R.C. § 271(a); I.R.C. § 279(c)(5)(A); I.R.C. § 465(c)(7)(D)(iv); I.R.C. § 542(c)(2); I.R.C. § 585(a)(2)(A); I.R.C. § 593(d)(1)(B)(ii); I.R.C. § 1281(b)(1)(C); I.R.C. § 6032; I.R.C. § 6695(f); I.R.C. § 7512(b). By so doing, those sections implicitly recognized that the § 581 definition would not apply without the express incorporation of that definition. Because § 956 does not adopt the § 581 definition, no statutory basis exists for applying the § 581 definition to § 956(b)(2)(A).

Although the Tax Code never suggests that the § 581 definition of "bank" applies to § 956(b)(2)(A), the Commissioner argues that under Revenue Ruling 70-385, the § 581 definition governs § 956(b)(2)(A). Revenue rulings are one of the four ways that the IRS can publicly memorialize its interpretations of the Tax Code. *See Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998). The other three methods are regulations issued pursuant to a specific congressional directive; regulations issued under the IRS's general authority to interpret tax laws; and private letter

(Emphasis added.) Based on Lyons's acknowledgment that a domestic subsidiary of MFE, such as the hypothetical MFE-US, would be taxed for purchasing the CDs, the Tax Court inferred that MFE-NV was created to avoid paying tax on the purchase of the CDs. Thus, the Tax Court concluded that the CDs held by MFE-NV were attributable to MFE.

### Taxpayer's Arguments

Taxpayer appeals both bases for the Tax Court's opinion. It argues that the Tax Court erred in its interpretation of the phrase "carrying on the banking business" because neither the business-facilitation requirement nor the related-party exception that the Tax Court read into § 956(b)(2)(A) are appropriate interpretations of the statute. In contesting the Regulation Issue, Taxpayer explains that its sole purpose for creating MFE-NV was asset protection and not to avoid § 956. If either of these arguments prevails, the Tax Court judgment must be reversed.

### The Commissioner's Arguments

The Commissioner urges us to affirm the Tax Court judgment for the reasons offered by the Tax Court. In addition, the Commissioner argues that the Tax Court's resolution of the § 956 Issue should be affirmed for three reasons: (1) the definition of "bank" under I.R.C. § 581 coupled with Revenue Ruling 70-385 excludes WFNNB as a "bank," thus WFNNB was not "carrying on the banking business"; (2) the fact that WFNNB is outside of the definition of "bank" in 12 U.S.C. §1841(c)(2)(F) means that WFNNB was not "carrying on the banking business"; and (3) the $174.9 million that MFE-NV paid for the CDs does not constitute a "deposit" under § 956 because that transaction would not have taken place between independent investors on the open market. After considering all of the arguments before us, we conclude that the Tax Court erred in deciding the § 956 Issue and on that basis we reverse its judgment.

### II.

## A. Standard of Review and Burden of Proof

Different standards of review apply to different components of the Tax Court's decision. The Tax Court's factual determinations are subject to a clearly erroneous standard of review. *Kearns v. Comm'r of Internal Revenue*, 979 F.2d 1176, 1178 (6th Cir. 1992) ("We generally review the Tax Court's findings of fact on the clearly erroneous standard."); *see also Gross v. Comm'r of Internal Revenue*, 272 F.3d 333, 342 (6th Cir. 2001). Under this standard, the Tax Court's findings of fact will be overruled only if we are "left with a definite and firm conviction that a mistake has been made." *Kearns*, 979 F.2d at 1178. Thus, we "must uphold the [T]ax [C]ourt's account of the evidence if it is plausible in light of the record viewed in its entirety." *Gross*, 272 F.3d at 343. In contrast, the Tax Court's legal conclusions are subject to *de novo* review. *Kearns*, 979 F.2d at 1178. When reviewing mixed questions of fact and law, we review the underlying factual determinations under a clearly erroneous standard and the application of the facts to the law under a *de novo* standard. *See Friedman v. Comm'r of Internal Revenue*, 216 F.3d 537, 541 (6th Cir. 2000) ("This Court reviews the Tax Court's findings of fact for clear error and its application of law *de novo*."); *MTS Int'l, Inc. v. Comm'r of Internal Revenue*, 169 F.3d 1018, 1021 (6th Cir. 1999) ("This court reviews the [T]ax [C]ourt's legal conclusions *de novo* and its findings of fact under the 'clearly erroneous' standard.").

These standards of review are evaluated against the backdrop of each party's burden of proof in the Tax Court. The Commissioner's determination that a tax deficiency existed is generally presumed to be correct. *Kearns*, 979 F.2d at 1178. Consequently, a taxpayer bears the burden of proving that the Commissioner's finding of a deficiency is erroneous or arbitrary by a preponderance of the evidence. *See* I.R.C. Rule 142(a)(1); *Kearns*, 979 F.2d at 1178.

concluding that a plain language reading – not applying a related-party exception – would be unreasonable. The plain text of § 956(b)(2)(A) encourages foreign company investment in domestic banks – even if those banks are related to the foreign company. While obviously not the policy that the Tax Court would promote were it an über-legislature, interpreting § 956(b)(2)(A) without a related-party prohibition hardly rises to a level of unreasonableness that merits ignoring the plain text of the statute.

### 3. The Commissioner's Reasons for Resolving the § 956 Issue in Its Favor Are Not Convincing.

Possibly sensing that the Tax Court's reasons for interpreting the phrase "carrying on the banking business" are inadequate, the Commissioner offers three alternative bases for concluding that WFNNB was not "carrying on the banking business." First, the Commissioner argues that the definition of "bank" under I.R.C. § 581 coupled with Revenue Ruling 70-385 should be read to exclude WFNNB as a "bank"; thus, WFNNB cannot carry on "the banking business." Second, the Commissioner contends that because the definition of "bank" in 12 U.S.C. §1841(c)(2)(F) excludes credit card companies, such as WFNNB, WFNNB cannot "carry on the banking business." Finally, the Commissioner submits that the CDs (i.e., the certificates of *deposit*) that MFE-NV received from WFNNB should not be considered "deposits" under § 956(b)(2)(A). Each of these arguments fails.

#### a. Neither the Definition of "Bank" in I.R.C. § 581 Nor Revenue Ruling 70-385 Apply Here.

The Commissioner argues that the definition of "bank" in I.R.C. § 581 controls here and excludes WFNNB as "a person carrying on the banking business." The Commissioner relies upon Revenue Ruling 70-385, which applied the § 581 definition of "bank" to § 956(b)(2)(A) exceptions in the context of foreign banks. *See* Rev. Rul. 70-385, 1970-2 C.B. 156. The Commissioner's argument is incorrect for three

REP. NO. 94-938, at 226 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3656. Because this enactment took place before the Competitive Equality Banking Act, which permitted credit card banks to be owned by non-banks, the Tax Court believed that Congress never considered the possibility that a CFC would make a transfer to a domestic subsidiary bank. Moreover, the Tax Court reasoned that it makes little sense to permit deposits with a related bank, but prohibit investments in a related corporation. To avoid rendering Congress's intent to impose a related-party prohibition meaningless after the enactment of the Competitive Equality Banking Act, the Tax Court reasoned that the related-party prohibition in § 956(b)(2)(F) must apply to § 956(b)(2)(A)'s reference to "deposits with a person carrying on the banking business." The Tax Court erred in its analysis.

Again, the Tax Court abandoned the plain language of § 956(b)(2)(A). Section 956(b)(2)(A) has no related-party prohibition. In fact, the statutory text of § 956 contains a related-party prohibition only in § 956(b)(2)(C) and (F) and (b)(3). If it had intended to impose a related-party prohibition on transfers under § 956(b)(2)(A), Congress could have easily made that prohibition more general or applied it beyond solely those subsections. Congress did not do either. Regardless of its reasons for not doing so, the plain language of § 956(b)(2)(A) has no related-party prohibition, and thus, there is no need to examine legislative history here.

The Tax Court examined legislative history because it found that the Competitive Equality Banking Act made reading § 956(b)(2)(A) without implying a related-party exception unreasonable. The Tax Court explained that had Congress known that banks could constitute related parties when it enacted § 956(b)(2)(A), it would have added a related-party exception to § 956(b)(2)(A). As a matter of policy that argument makes sense, but it is not the Tax Court's role to inject its own policy determinations into the plain language of statutes. Moreover, the Tax Court erred in

## B.   The § 956 Issue

Taxpayer appeals the Tax Court's legal interpretation of the phrase "deposit with persons carrying on the banking business" as used in § 956(b)(2)(A). Because this challenge involves an interpretation of law, we review the Tax Court's decision *de novo*.

Before interpreting § 956(b)(2)(A), we first review relevant canons of statutory construction. Setting the tone for our statutory analysis is the principle that statutes imposing a tax are construed liberally in favor of the taxpayer. *Weingarden v. Comm'r of Internal Revenue*, 825 F.2d 1027, 1029 (6th Cir. 1987). With that perspective in mind, we look first to the plain language of the statute. *See United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 338-39 (6th Cir. 2000) ("The starting point in a statutory interpretation case is the language of the statute itself."); *United States v. Ables*, 167 F.3d 1021, 1028 (6th Cir. 1999); *United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998). When the text of a statute contains an undefined term, that term receives its ordinary and natural meaning. *See Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994); *Smith v. United States*, 508 U.S. 223, 228 (1993); *United States v. Moses*, 137 F.3d 894, 899 (6th Cir. 1998); *see also Wuebker v. Comm'r of Internal Revenue*, 205 F.3d 897, 905 (6th Cir. 2000) (Jones, J., dissenting) (interpreting an undefined term in the Internal Revenue Code in accord with its ordinary meaning). As a further aide in determining the meaning of an undefined term, the maxim of *noscitur a sociis* – it is known from its associates – directs us to look to accompanying words to deduce the undefined word's meaning. *See Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997); *see also Kurinsky v. United States*, 33 F.3d 594, 597 (6th Cir. 1994). Where this textual analysis fails to produce a conclusive result, or where it leads to ambiguous or unreasonable results, a court may look to legislative history to interpret a statute. *See Palmer v. United States (In re Palmer)*, 219 F.3d 580, 584 (6th Cir. 2000); *Hoffman v. Comshare, Inc. (In re Comshare, Inc. Secs. Litig.)*,

183 F.3d 542, 549 (6th Cir. 1999); *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998). Resort to legislative history is not appropriate, however, if the text of the statute may be read unambiguously and reasonably. *Koenig Sporting Goods, Inc. v. Morse Rd. Co. (In re Koenig Sporting Goods)*, 203 F.3d 986, 988 (6th Cir. 2000) ("When a statute is unambiguous, resort to legislative history and policy considerations is improper."); *Mills*, 140 F.3d at 633 ("Only when the language of the legislation is unclear should we look beyond the wording of the statute to the intent of the legislature.").

### 1.   It Is Improper to Impute the Business Facilitation Meaning to § 956(b)(2)(A).

The parties disagree over whether the CDs that MFE-NV purchased from WFNNB constitute "deposits with persons carrying on the banking business." The Tax Court interpreted the word "the" in "the banking business" as referring to a particularized banking business and examined legislative history to discern which particular banking business Congress intended § 956 to govern. The Tax Court's conclusion was incorrect because the phrase "persons carrying on the banking business" has an ordinary and natural meaning wherein credit card companies, such as WFNNB, constitute "persons carrying on the banking business." However, if the use of the word "the" is capable of two distinct meanings, it is more appropriate to interpret "the" as limiting the "business" to that of "banking." Under that reading, WFNNB still "carries on the banking business." Because a plain language reading of § 956(b)(2)(A) is neither ambiguous nor unreasonable, there is no need to look to legislative history here.

The parties dispute whether § 956(b)(2)(A)'s reference to "carrying on the banking business" applies to credit card companies like WFNNB. As mentioned above, in construing a statute, a court starts with the plain language. *See Health Possibilities*, 207 F.3d at 338-39; *Ables*, 167 F.3d at 1028; *Mills*, 140 F.3d at 633. Regrettably, that canon of

interpret the plain language of § 956(b)(2)(A). Before the Tax Court read in the complex business-facilitation requirement, it should have instead relied on another principle of statutory interpretation – statutes imposing a tax should be interpreted liberally in favor of the taxpayer. *Weingarden*, 825 F.2d at 1029. Thus, rather than force a complex meaning from legislative history, the Tax Court should have instead construed § 956(b)(2)(A) in Taxpayer's favor.

In sum, both the Tax Court's analytical framework and its conclusions regarding the definition of the phrase "carrying on the banking business" are incorrect. Under a correct statutory interpretation, WFNNB is "carrying on the banking business." Although it is not necessary to look beyond the ordinary meaning of the words in § 956(b)(2)(A) to reach that conclusion, an application of *noscitur a sociis* confirms that result. For those reasons, WFNNB should be interpreted as "carrying on the banking business" under § 956(b)(2)(A).

### 2.   The Tax Court Erred in Finding an Implied Related-Party Prohibition in § 956(b)(2)(A).

Another basis for the Tax Court's resolution of the § 956 Issue was its finding of an implied related-party prohibition in § 956(b)(2)(A). Under the Tax Court's reading of § 956(b)(2)(A), "deposits with persons carrying on the banking business" are excepted from the definition of "United States property" only if the "persons carrying on the banking business" are unrelated to the entity making the deposit. The Tax Court reached this conclusion, which contradicts the plain meaning of § 956(b)(2)(A), based on legislative history of the 1976 amendments to § 956(b)(2)(F) and (G). In creating these new exceptions to the definition of "United States property" in 1976, Congress explicitly limited the § 956(b)(2)(F) exception to transfers between unrelated corporations. *See* Tax Reform Act of 1976, Pub. L. No. 94-455 (1976); I.R.C. § 956(b)(2)(F). The legislative history explained that United States shareholders of a CFC should not be able to use the earnings of the CFC without paying tax. S.

dictionary example of "the seafood  industry," it is also reasonable to read "the" as limiting "business" to a business dealing with "banking."  For that reason, the application of Definition #2 is consistent with the plain language of § 956(b)(2)(A).

In short, a hypertechnical analysis of the term "the" suggests that it may be capable of two meanings when used in § 956(b)(2)(A) to modify "banking business."  Testing these two potential definitions in context reveals that only Definition #2 can be sensibly applied.  Consequently, "the," as used in the context of § 956(b)(2)(A), limits "business" to a business dealing with banking.  Because WFNNB is a business dealing with banking (as the Tax Court conceded), WFNNB "carries on the banking business" for purposes of § 956(b)(2)(A).

### c.    The Tax Court Erred in Examining Legislative History.

Rather than resolve this dispute through an ordinary and natural reading of § 956(b)(2)(A) or by considering which definition of "the" should have controlled, the Tax Court raced to the legislative history of § 956 to support its particularized definition of "the."  From the Senate and House Reports covering the enactment of § 956, the Tax Court concluded that the exceptions to the definition of "United States property" were meant to apply "only where the property located in the United States is ordinary and necessary to the *active* conduct of the foreign corporation's business or substantially the same trade or business." (quoting H.R. REP. NO. 87-1447 at 65 (1962) (emphasis added by the Tax Court)).  Under this reading, the Tax Court concluded that "the" referred to a particular banking business that aids the domestic business activities of CFCs.

The Tax Court erred in attributing that implied business-facilitation meaning to the word "the."  And, in its zeal "to effectuate the intent of Congress," the Tax Court failed to

construction by itself provides little help here because neither the Internal Revenue Code nor the United States Code defines the phrase "the banking business."  Fortunately, two other canons of construction assist our efforts: (1) undefined terms are construed in accordance with their ordinary and natural meanings and (2) the meaning of an undefined term may be deduced from nearby words under *noscitur a sociis*.

### a.    Construing Undefined Terms in Accordance with Their Ordinary and Natural Meanings, WFNNB Is "Carrying on the Banking Business."

When a word is not defined by statute, courts construe the undefined term in accord with its ordinary or natural meaning. *See Meyer*, 510 U.S. at 476; *Smith*, 508 U.S. at 228; *Moses*, 137 F.3d at 899.  Because there is no dispute that WFNNB carries on a "business," we do not focus on that term.  Rather, we turn to the term "banking" and note that at the time Congress enacted § 956(b)(2)(A), it was commonly defined as:

> the business of a bank, orig. restricted to money changing and now devoted to taking money on deposit subject to check or draft, loaning money and credit (as by discounting notes and bills), issuing drafts and any other associated form or general dealing in money or credit.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 172 (Philip Babcock Gove, ed., 1961).

In light of that definition, WFNNB carries on "the banking business."  WFNNB is a nationally chartered bank that issues credit cards.  As such, it extends credit and receives payment for those loans.  WFNNB also accepts certain deposits.  Moreover, WFNNB is regulated by the Office of the Comptroller of Currency and the Federal Reserve.  Also, it is insured by the Federal Deposit Insurance Corporation.  And, as Taxpayer points out, in light of its national charter, the only business that WFNNB could possibly be engaged in is "the banking business."  Thus, under an ordinary and natural

reading, WFNNB carries on "the banking business." For those reasons, there is little need to stretch a common understanding of "the banking business" to exclude WFNNB here.

### b.   Using *Noscitur a Sociis* to Interpret § 956(b)(2)(A), WFNNB Is "Carrying on the Banking Business."

Rather than conduct the above plain-language analysis, the Tax Court focused on the term "the" in the phrase "the banking business." Reading meaning into a definite article has been rejected by at least one other circuit and it is hardly the wisest place to begin statutory interpretation. *See Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1284 n.4 (D.C. Cir. 1991) (refusing to use distinctions between "the" and "an" in interpreting a statute because that approach was "overly formalistic and inconsistent with Supreme Court case law"). Nevertheless, even if the term "the" is capable of two meanings, under *noscitur a sociis*, only one meaning makes sense in the context of § 956(b)(2)(A).

Under a hypertechnical analysis, at odds with a plain language interpretation of the statute, the word "the" as used in "the banking business" at the time Congress enacted § 956(b)(2)(A) may have had two relevant meanings:

Definition #1:   used as a function word to indicate that a following noun or noun equivalent refers to someone or something previously mentioned or clearly understood from the context or the situation. <if anyone offers you a dollar for that picture, take ~ dollar> <put ~ cat out > <this is a good shirt but ~ sleeves are too long>.

Definition #2:   used as a function word with a noun modified by an adjective or by an attributive noun to limit the application of the modified noun to that specified by the

adjective or by the attributive noun <~ right answer> <~ privileged classes> <~ English language> <~ greatest difficulty> <~ third time> <~ Boston road> <~ seafood industry>.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2368 (Philip Babcock Gove, ed., 1961). The Tax Court considered only Definition #1 and concluded that "the" had to refer to a particularized banking business. But, from Definition #2, it is also possible that "the" is a function word used to limit the noun "business" to mean only "banking business." In deciding which of these two definitions should apply, we look to nearby words in the statute.

Under Definition #1, "the" refers to "something previously mentioned or clearly understood from the context or situation." For "the" to mean a particularized banking business under Definition #1, the particularized banking business must have been previously mentioned or clearly understood from the context of the situation. Undoubtedly, § 956 makes no prior reference to a specific banking business. Thus, the only way that "the" could fit Definition #1 is if a particularized banking business is clearly understood from the context or the situation. Here, there is no particularized banking business that could be reasonably inferred from the context of the statute. Due to the absence of either a prior reference or a clear contextual meaning, the text of § 956 does not support the use of Definition #1 here.

In contrast, the plain language of § 956(b)(2)(A) supports the use of Definition #2 here. Under Definition #2, "the" modifies adjective-noun phrases, as in the dictionary example, "the seafood industry," to limit the application of the noun to that specified by the adjective. In the example, "the seafood industry," the "industry" referred to is limited to an industry dealing with "seafood." Applying Definition #2 is reasonable here because as used in § 956(b)(2)(A), "the" modifies an adjective-noun phrase, "banking business." And, as with the