*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

CHRYSLER CORPORATION, fka Chrysler Holding
Corporation, as Successor by Merger to Chrysler
Motors Corporation and its Consolidated
Subsidiaries,

          *Petitioner-Appellant,*

      *v.*

COMMISSIONER OF INTERNAL REVENUE,

          *Respondent-Appellee.*

No. 03-1214

>

————————————

On Appeal from the United States Tax Court.
No. 22148-97—David Laro, Tax Court Judge.

Argued: September 14, 2005

Decided and Filed: February 8, 2006

Before: BOGGS, Chief Judge; NORRIS and COOK, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Jennifer L. Fuller, Kenneth B. Clark, FENWICK & WEST, Mountain View, California, for Appellant. Joan I. Oppenheimer, Bridget M. Rowan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jennifer L. Fuller, Kenneth B. Clark, William F. Colgin, Barton W.S. Bassett, James P. Fuller, Ronald B. Schrotenboer, FENWICK & WEST, Mountain View, California, for Appellant. Joan I. Oppenheimer, Gilbert S. Rothenberg, Charles Bricken, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

————————————

## OPINION

————————————

ALAN E. NORRIS, Circuit Judge. Chrysler Corporation appeals from three adverse Tax Court rulings that granted partial summary judgment to the Commissioner of Internal Revenue. The disputed tax computations stem from the early to mid-1980s and involve substantial sums of potential tax liability. These rulings present the following questions: 1) Under the accrual accounting method used by Chrysler, was the company permitted to deduct anticipated warranty expenses in the year that it sold warranted motor vehicles to its dealers even though warranty claims had not necessarily been made? 2) Was Chrysler barred by the ten-year statutory limitations period

1

from altering certain foreign tax credit elections?  3)  Did costs associated with the redemption of Chrysler's Employee Stock Option Plan ("ESOP") constitute deductible capital expenditures?

This case essentially involves three discrete appeals.  For that reason, we will abandon our usual practice of beginning our opinion with a generalized background section in favor of treating each issue individually, providing the necessary factual context in conjunction with our legal analysis.

## I.

### Deduction for Anticipated Warranty Expenses

In its opinion, the Tax Court framed the issue in these terms:

> We must decide whether for Federal income tax purposes all events necessary to determine petitioner's liability for its warranty expenses have occurred when it sells its vehicles to its dealers; in other words, has petitioner satisfied the first prong of the all events test entitling it to deduct its estimated future warranty costs on the sale of such vehicles?

*Chrysler Corp. v. Comm'r*, No. 22148-97, 2000 WL 1231528, 80 T.C.M. (CCH) 334, T.C.M. (RIA) 2000-283 (Aug. 31, 2000).  Although discussed in more detail shortly, the "all events test" alluded to by the Tax Court provides as follows:

> Under an accrual method of accounting, a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability.

Treas.  Reg. § 1.461-1(a)(2)(i) (2001).  In this appeal, only the first prong of the test – whether the "fact of the liability" has been established – is at issue.

The parties agree that this court reviews *de novo* a grant of summary judgment by the Tax Court.[1]  *Roberts v. Comm'r*, 329 F.3d 1224, 1227 (11th Cir. 2003).

In tax years 1984 and 1985, Chrysler included deductions of $567,943,243 and $297,292,155 on its federal income tax returns on the basis that it incurred those amounts as warranty expenses for motor vehicles sold in those years to its dealers.  A sale generally occurred when a vehicle was delivered to the carrier for shipment to the dealer.

New vehicle warranties, which are at issue here, cover defects in material and manufacture.  As Chrysler points out, state and federal laws regulate the entire warranty regime.  Specifically, the Uniform Commercial Code, as adopted by virtually every state, state "lemon" laws, and the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301-12 ("Magnuson-Moss"), impose warranty obligations on the seller.  During the period at issue, every new vehicle sold by Chrysler was covered by a warranty. When selling a new vehicle, dealers would provide buyers with a warranty manual that explained its terms and limitations.

---

[1]Because this court must view the facts in a light most favorable to Chrysler, *id.* at 1227, we rely on the parties' Stipulation of Facts dated June 5, 2000, their Joint Stipulation of Agreed Upon Facts dated July 11, 2000, and the representations made by Chrysler in its briefs to this court.

Chrysler offered two kinds of express warranty: a basic warranty that applied to the first 12 months or 12,000 miles, and an extended warranty that covered certain types of repairs after the basic warranty had expired. In turn, Chrysler contracted with its dealers to repair vehicles under warranty. Typically, dealers would make repairs and then seek reimbursement from the company. However, dealers were required to comply with certain agreed upon procedures to substantiate their reimbursement requests that, if not followed, could result in non-payment. By 1984 Chrysler had installed a computer system known as the Dealer Information Access Link ("DIAL"), which an increasing number of dealers used to report warranty repairs that were subject to reimbursement. DIAL made it easier for Chrysler to track and respond to warranty claims.

Chrysler engaged consultant Arthur D. Little, Inc., to calculate the amount of warranty expenses the company incurred for tax years 1984 and 1985. Chrysler uses the accrual method of accounting and a tax year based upon the calendar year. It is undisputed that the expenses incurred by Chrysler to fix conditions covered by warranty constitute "ordinary and necessary" business expenses under 26 U.S.C. § 162. During the period at issue, Chrysler accrued the entire estimated cost of its warranties in the year that it sold the vehicles to the dealers. Chrysler included this liability on its balance sheet and took it into account in the calculation of net (BOOK) income.

The Commissioner reduced Chrysler's warranty cost deduction for 1984 by $287,939,317, which had the ripple effect of increasing the company's 1985 deduction for such costs by $62,767,885.

The Tax Court framed the legal question in these terms:

> Whether a business expense has been "incurred" so as to entitle an accrual-basis taxpayer to deduct it under section 162(a) is governed by the "all events" test as set out in *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926). In *Anderson*, the Supreme Court held that a taxpayer was entitled to deduct from its 1916 income a tax on profits from munitions sales that took place in 1916. Although the tax would not be assessed and therefore would not formally be due until 1917, all the events had occurred in 1916 to fix the amount of the tax and to determine the taxpayer's liability to pay it. . . .
>
> [U]nder the regulations, the all events test has two prongs, each of which must be satisfied before accrual of an expense is proper. First, all the events must have occurred which establish the fact of the liability. Second, the amount must be capable of being determined "with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs. (accrual of deductions); sec. 1.446-1(c)(1)(ii), Income Tax Regs. (accrual in general). For the purpose of deciding this motion, only the first prong of the test is relevant. For the purpose of the first prong of the test the Supreme Court has stated that the liability must be "final and definite in amount", *Security Flour Mills Co. v. Commissioner*, 321 U.S. 281, 287, 64 S.Ct. 596, 88 L.Ed. 725 (1944), "fixed and absolute", *Brown v. Helvering*, 291 U.S. 193, 201, 54 S.Ct. 356, 78 L.Ed. 725 (1934), in order to be deductible.

*Chrysler,* 2000 WL 1231528, 80 T.C.M. (CCH) 334, T.C.M. (RIA) 2000-283 (Aug. 31, 2000) (citations and footnote omitted).

Having set the legal stage, the court then examined and distinguished two Supreme Court opinions urged upon it by the parties: *United States v. Hughes Prop. Inc.*, 476 U.S. 593 (1986), and *United States v. Gen. Dynamics Corp.*, 481 U.S. 239 (1987). Because we agree that these cases are central to the resolution of this particular question, we find it useful to begin our discussion with reference to the construction given to them by the Tax Court:

[Chrysler] places reliance on *United States v. Hughes Properties, Inc.*, 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986), for the proposition that statutory liabilities satisfy the first prong of the all events test. . . .

In *Hughes Properties*, the taxpayer was a Nevada casino that was required by State statute to pay as a jackpot a certain percentage of the amounts gambled in progressive slot machines. The taxpayer was required to keep a cash reserve sufficient to pay the guaranteed jackpots when won. Hughes Properties at the conclusion of each fiscal year entered the total of the progressive jackpot amounts (shown on the payoff indicators) as an accrued liability on its books. From that total, it subtracted the corresponding figure for the preceding year to produce the current tax year's increase in accrued liability. On its Federal income tax return this net figure was asserted to be an ordinary and necessary business expense and deductible under section 162(a). The Court found that the all events test had been satisfied and the taxpayer was entitled to the deduction. The Court reasoned that the State statute made the amount shown on the payout indicators incapable of being reduced. Therefore the event creating liability was the last play of the machine before the end of the fiscal year, and that event occurred during the taxable year.

We conclude that the cases cited by [Chrysler] do not strictly stand for the proposition that if a liability is fixed by statute, that fact alone meets the first prong of the all events test. Rather we are of the opinion that the first prong of the all events test may be met when a statute has the effect of irrevocably setting aside a specific amount, as if it were to be put into an escrow account, by the close of the tax year and to be paid at a future date. In the instant case, the applicable statutes do not so provide.

[The Commissioner] relies on the analysis contained in the Supreme Court's opinion in *United States v. General Dynamics Corp.*, 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987). In *General Dynamics*, the taxpayer, who self-insured its employee medical plan, deducted estimated costs of medical care under the plan. The employer's liability was determinable. The employees' medical needs had manifested themselves, employees had determined to obtain treatment, and treatment had occurred. The only events that had not occurred were the employees' filing claims for reimbursement before the end of the taxable year. The Supreme Court found that the all events test was not met until the filing of properly documented claims. The filing of the claim was the last event needed to create the liability and therefore absolutely fix the taxpayer's liability under the first prong of the all events test. *See id.* at 244.

[Chrysler] focuses on the fact that the liability in *United States v. Hughes Properties, Inc., supra*, was in part fixed by operation of statute and concludes from that the first prong of the all events test is satisfied if a statute in part works to fix the liability. We do not agree. In both *Hughes Properties* and *General Dynamics* the Supreme Court focused on the last event that created the liability. In *Hughes Properties* the event creating liability was the last play of the machine before the end of the fiscal year. Because the Nevada statute fixed the amount of the irrevocable payout, that play crystalized or fixed absolutely the taxpayer's liability, thus satisfying the first prong of the all events test. In *General Dynamics*, the last event that created the liability was the employee filing the claim for reimbursement.

We are unable to find sufficient differences between the facts in *General Dynamics* and those of the instant case to justify departing from the Supreme Court's

> analysis. Here, as in *General Dynamics*, the last event fixing liability does not occur before the presenting of a claim, either a claim for warranty service by the customer through one of petitioner's dealers or a claim for reimbursement made on petitioner by the dealer.

*Id.* (footnotes and citations omitted).

As the decision of the Tax Court makes clear, the central issue on appeal is precisely what a taxpayer must do in order to establish liability with sufficient certainty to satisfy the first prong of the "all events test."[2] We would be less than candid if we did not acknowledge a degree of sympathy with Justice O'Connor's observation in *General Dynamics* that "[t]he circumstances of this case differ little from those in *Hughes Properties*." *Gen. Dynamics*, 481 U.S. at 248 (dissenting). However, given that the Court reached the opposite result in successive terms when faced with similar sets of facts, we must do our best to distinguish the two cases. As did the Tax Court, we see no viable way of reconciling *Hughes Properties* with *General Dynamics* other than by reading the former to stand of the proposition that "[t]he first prong of the all events test may be met when a statute has the effect of irrevocably setting aside a specific amount . . . by the close of the tax year and to be paid at a future date." *Chrysler Corp. v. Comm'r, supra*. The Court in *General Dynamics* held that the "last link in the chain of events creating liability for purposes of the 'all events test'" was the actual filing of a medical claim. *Gen. Dynamics*, 481 U.S. at 245. It based its reasoning on the fact that "General Dynamics was . . . liable to pay for covered medical services *only* if properly documented claims forms were filed." *Id.* at 244.

Like General Dynamics, Chrysler faces *potential* liability, which in its case is based upon the express and implied warranties that accompany the sale of its motor vehicles. However, that liability does not become firmly established until a valid warranty claim is submitted. As the Court explained, "Nor may a taxpayer deduct an estimated or an anticipated expense no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year." *Gen. Dynamics* at 243-44 (citing *Brown v. Helvering*, 291 U.S. 193, 201 (1934)). The court distinguished the Code's treatment of insurance companies – allowed by 26 U.S.C. § 832 to deduct reserves for "incurred but not reported" claims – from its treatment of non-insurance companies restrained from deducting "claims that [are] actuarially likely but not yet reported." *Id.* at 246. We assume that the DIAL software made it easier for Chrysler to track and process warranty claims; it may also have assisted Arthur D. Little in calculating the cost to the company of future claims. However, even if those claims were predictable with relative accuracy, they were not actually submitted during the taxable year and therefore cannot be deducted because they remain "anticipated expenses." *See id.* at 245 ("Based on actuarial data, General Dynamics may have been able to make a reasonable estimate of how many claims would be filed . . . [b]ut that alone does not justify a deduction.").

In reaching this conclusion, we readily acknowledge that Chrysler has raised a number of thoughtful points. First among them is the contention that the anticipated warranty claims at issue should be analyzed with reference to the second prong of the "all events test," that is, whether "the amount of the liability can be determined with reasonable accuracy." Despite its surface appeal, this argument fails to recognize that it is not the imprecise amount of the claims that renders them non-deductible but their contingent nature. While Chrysler relies in part upon the existence of statutes, such as Magnuson-Moss, to establish the "fact" of its liability, they impose legal duties with respect to warranties but do not necessarily fix liability. Among other things, Magnuson-Moss prescribes the contents of warranties, 15 U.S.C. § 2302, and remedies available to consumers who seek to

---

[2]"The taxpayer has the burden of proving its entitlement to a deduction." *Gen. Dynamics*, 481 U.S. at 245 (citing *Helvering v. Taylor*, 293 U.S. 507, 514 (1935)).

enforce their terms, 15 U.S.C. § 2310.  However, simply because a manufacturer has provided a warranty to a consumer, the scope of which is defined to a some degree by statute, does not mean that liability has attached; until a claim has been filed invoking the terms of a warranty, liability remains contingent and, because of that fact, non-deductible.

The parties have cited numerous cases to us in their briefs.  That we have declined to discuss them here should not be taken as a sign that they have not been fully considered.  Rather, it means that, like the Tax Court, we conclude that this issue hinges upon our construction of *Hughes Properties* and, more importantly, *General Dynamics.*  For the reasons just outlined, we detect no material distinction between *General Dynamics* and the case before us.  Consequently, we affirm the judgment of the Tax Court.

## II.

### Foreign Tax Credits

Chrysler experienced dire financial difficulties in the late 1970s and early 1980s.  In the tax years 1980 through 1982, it reported no taxable domestic income and paid no taxes to the United States.  However, it did pay foreign taxes during that period.  Rather than elect to take a credit for foreign taxes paid, 26 U.S.C. § 901(a), Chrysler took a tax deduction, 26 U.S.C. § 164(a)(3), for those years.  These deductions were substantial: $34,556,085 (1980); $7,020,844 (1981); and $3,631,958 (1982).

On July 6, 1992, the Commissioner informed Chrysler of tax deficiencies for the years 1984 and 1985.  In an attempt to reduce that liability, the company filed amended tax returns on July 24, 1995 for the years 1980 through 1985.  At the time that it filed those amended returns, only years 1983 through 1985 were open for purposes of assessment of tax by the Commissioner or for a claim of credit or refund by Chrysler.  Nonetheless, Chrysler sought to amend its 1980 through 1982 returns to change the foreign tax deductions to foreign tax credits, which could then be carried forward to its tax liabilities for 1984 and 1985.

In his notice of deficiency, the Commissioner advised the company that "to the extent your claims are attributable to [foreign tax credit] carryforwards from the years ended December 31, 1980, December 31, 1981, and December 31, 1982, the ten-year statute of limitations for making a timely election to claim foreign tax credit has expired and those carryforwards are not allowable."  In response, Chrysler filed a petition with the Tax Court.

Three provisions of the Internal Revenue Code come into play for purposes of this appeal.  The first provides as follows:

> **(a) Allowance of credit.** – If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960.  Such choice *for any taxable year* may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for *such taxable year*. . . . .

26 U.S.C. § 901(a) (emphasis added).  It is undisputed that the limitations period set forth in 26 U.S.C. § 6511(d)(3)(A) applies to § 901(a).  This section provides as follows:

**(3)  Special rules relating to foreign tax credit. –**

  **(A) Special period of limitation with respect to foreign taxes paid or accrued** – If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country . . . for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 . . . in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 10 years from the date prescribed by law *for filing the return for the year with respect to which the claim is made.*

26 U.S.C. § 6511(d)(3)(A) (emphasis added).[3]  The final statutory section that comes into play is 26 U.S.C. § 904(c), which was added to the Internal Revenue Code in 1958 in order to allow taxpayers to carry forward or carry back portions of a foreign tax credit that could not be used in the tax year for which they were originally claimed:

  **Carryback and Carryover of Excess Tax Paid.** – Any amount by which all taxes paid or accrued to foreign countries or possessions of the United States for any taxable year for which the taxpayer chooses to have the benefits of this subpart exceed the limitations under subsection (a) shall be deemed taxes paid or accrued to foreign countries or possessions of the United States in the second preceding taxable year, in the first preceding taxable year, and in the first, second, third, fourth, or fifth succeeding taxable years, in that order . . . .  Such amount deemed paid or accrued in any year may be availed of only as a tax credit and not as a deduction and only if the taxpayer for such year chooses to have the benefits of this subpart as to taxes paid or accrued for that year to foreign countries or possessions of the United States.

26 U.S.C. § 904(c).

  The United States Court of Claims addressed the same question that faces us some years ago, which it framed in these terms: "[W]hether in cases where there has been a carryover of foreign taxes under section 904(c), the limitations period of section 6511(d)(3)(A) commences with the date prescribed by law for filing the return for the year *from which* the excess foreign taxes are carried, or with the date prescribed by law for filing the return for the year *to which* the excess foreign taxes are carried." *Ampex Corp. v. United States*, 620 F.2d 853, 857 (Ct. Cl. 1980) (emphasis original). In other words, do the phrases "such taxable year" as used in § 901(a) and "year with respect to which the claim is made" as used in § 6511(d)(3)(A) mean the year in which the foreign taxes are paid and the right to claim a credit accrues?  Or, do they refer to the year in which the foreign tax credit is to be applied?   If the latter interpretation is correct, then Chrysler meets the 10-year limitations period because it sought in 1995 to apply the foreign tax credits to its 1985 return.  If the former construction holds, then Chrysler is precluded from amending because the years in which the tax credits accrued (1980 through 1982) fall outside the limitations period.

  The Tax Court reached the following conclusion:

  Section 901(a) allows a taxpayer such as [Chrysler] to elect to credit income taxes owed to a foreign country in lieu of deducting them under section 164(a)(3). [The Commissioner] argues that [Chrysler's] election was untimely. [The Commissioner] asserts that the phrases "for any taxable year" and "for such taxable year" that appear in section 901(a) refer to [Chrysler's] 1980, 1981, and 1982 taxable

---

[3]We note that, while this version of the statute applies to the instant appeal, it was amended by Congress in 1997 so that the highlighted language now provides, "for filing the return for the year in which such taxes were actually paid or accrued."  Taxpayer Relief Act of 1997, Pub. L. No. 105-34, 111 Stat. 788, 945.

years rather than [Chrysler's] 1985 taxable year. [Chrysler] argues that its election was timely. Because section 904(c) allows a taxpayer to carry over a foreign tax credit for up to 5 years, [Chrysler] asserts, section 901(a), when read in the light of section 6511(d)(3)(A), generally allows a taxpayer up to 15 years to elect or change its election under section 901(a). [Chrysler] concludes that the relevant phrases refer to the year for which the overpayment is claimed on account of the foreign taxes; here, 1985. [Chrysler] asserts that its conclusion comports with Congress' intent for section 901(a), *i.e.*, to avoid subjecting a taxpayer's foreign earnings to taxation by both the foreign country and the United States, and that its conclusion is consistent with the application of section 6511(d)(3)(A).

We agree with [the Commissioner] that the 10-year period under section 901(a) is measured from the years for which [Chrysler] elected the foreign tax credits; *i.e.*, 1980, 1981, and 1982. We read the phrase "for such taxable year" to refer to the "any taxable year" specified at the beginning of the same sentence, or, in other words, to the year for which the election of the foreign tax credit is made. The only other time that Congress used the word "such" in section 901(a) it did so to refer to the "choice" made by the taxpayer described in the first sentence of section 901(a). We believe it logical to conclude that Congress' use of the second "such", *i.e.*, the one at issue, refers to the only "taxable year" described in section 901(a); namely, the year for which the election of the foreign tax credit is made.

Our reading comports with the Commissioner's regulations prescribed under section 901(a). Section 1.901-1(d), Income Tax Regs., provides that "The taxpayer may, for a particular taxable year, claim the benefits of section 901 (or claim a deduction in lieu of a foreign tax credit) at any time before the expiration of the period prescribed by section 6511(d)(3)(A)". Here, [Chrysler] aims to "claim the benefits of section 901" for 1980, 1981, and 1982 and not for 1985. The benefits which [Chrysler] is attempting to avail itself of in 1985 are the benefits of section 904(c).

. . . .

We hold that [Chrysler's] elections for 1980, 1981, and 1982 were untimely. Accordingly, we will grant [the Commissioner's] motion for partial summary judgment.

*Chrysler Corp. v. Comm'r*, 116 T.C. 465, 469-70 (2001) (footnotes omitted).

Where, as here, the facts are undisputed and the issue is one of statutory construction, we review the judgment of the Tax Court *de novo*. *Intermet Corp. & Subsidiaries v. Comm'r*, 209 F.3d 901, 903 (6th Cir. 2000) (citing *Estate of Mueller v. Comm'r*, 153 F.3d 302, 304 (6th Cir. 1998)); *accord Hospital Corp. of America & Subsidiaries v. Comm'r*, 348 F.3d 136, 140 (6th Cir. 2003) (Tax Court interpretation of statutory provisions reviewed *de novo*); *Limited, Inc. v. Comm'r*, 286 F.3d 324, 331 (6th Cir. 2002) (legal conclusions subject to *de novo* review).

Chrysler reminds us that the underlying purpose of the statutory scheme governing foreign tax credits, which had its genesis in the Revenue Act of 1918, 40 Stat. 1057, is to "mitigate the evil of double taxation." *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 7 (1932); *see also Ampex Corp.*, 620 F.2d at 859-60 (discussing history of foreign tax credit); *Hart v. United States*, 585 F.2d 1025, 1029-32 (Ct. Cl. 1978) (noting inconsistencies between legislative history and language of statutes at issue). When construing a legislative enactment, we must give effect to the intent of the legislature adopting the statute in question. *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396

F.3d 762, 769 (6th Cir. 2005), *cert. denied*, 74 U.S.L.W. 3026 (U.S. Oct. 3, 2005) (No. 05-31). While statutes imposing a tax are generally construed liberally in favor of the taxpayer, *Limited*, 286 F.3d at 332 (citing *Weingarden v. Comm'r*, 825 F.2d 1027, 1029 (6th Cir. 1987)), those granting a deduction are matters of "legislative grace" and are strictly construed in favor of the government. *Intermet Corp.*, 209 F.3d at 904 (also citing *Weingarden* at 1029); *Burroughs Adding Mach. Co. v. Terwilliger*, 135 F.2d 608, 610 (6th Cir. 1943) ("The right to the [foreign tax] credit claimed is a privilege granted by the Government, and hence the statute is to be strictly construed in favor of the Government."); *but see Gentsch v. Goodyear Tire & Rubber Co.*, 151 F.2d 997, 1000 (6th Cir. 1945) (rejecting strict construction because "[r]elief from double taxation is not so much an act of grace as one of justice").

Turning to the task at hand, we note that legislative intent should be divined first and foremost from the plain language of the statute. *Broadcast Music*, 396 F.3d at 769; *Limited*, 286 F.3d at 332. If the "text of the statute may be read unambiguously and reasonably," our inquiry is at an end. *Limited* at 332; *accord United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) ("[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear") (quoting *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000)). Only when our reading results in ambiguity or leads to an unreasonable result, may we look to the legislative history. *Limited* at 332. Finally, we must construe a statute as a whole and, in so doing, we must strive to "interpret provisions so that other provisions in the statute are not rendered inconsistent, superfluous, or meaningless." *Broadcast Music* at 769.

With these precepts in mind, we turn to the statutes in question, beginning with 26 U.S.C. § 901(a), the provision generally authorizing foreign tax credits. The critical sentence reads, "Such choice for *any taxable year* may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for *such taxable year*." Chrysler concedes that the initial reference to "any taxable" year means the year in which the initial election was made. Like the Tax Court, we agree that the subsequent modifier "such" must refer to something already alluded to – in this case the year in which the taxpayer elected to claim a foreign tax credit.

If § 901(a) existed in isolation, that would end the matter. However, as mentioned earlier, it is undisputed that the "period prescribed for making a claim for credit or refund" incorporates the limitations period set forth in 26 U.S.C. § 6511(d)(3)(A). That provision establishes a ten-year window for the taxpayer to claim a credit "for the year with respect to which the claim is made." In our view, the most reasonable reading of these two statutes is that the "such taxable year" of § 901(a) and the "year with respect to which the claim is made" of § 6511(d)(3)(A) refer to the same year: the year in which the taxpayer first made its election whether to claim a foreign tax credit. We recognize that the Court of Claims has reached a different conclusion. *Ampex*, 620 F.2d at 858 ("[I]f the time of the commencement of the limitations period of section 6511(d)(3)(A) is to be determined solely on the basis of the language of that section, the limitations period begins to run on the date prescribed by law for filing the return for the year for which a refund is sought."). In our view, however, nothing in the language of § 6511(d)(3)(A) alters our initial reading of § 901(a), which fixes the year in question as the year of election. All that § 6511(d)(3)(A) provides to the taxpayer is a longer limitations period for altering its election of a foreign tax credit than the three-year limitations period prescribed by § 6511(a). The touchstone for triggering the statute of limitations remains the original year of election.

Lastly, we must consider whether § 904(c), which authorizes a taxpayer to either carry over or carry back its application of a foreign tax credit, affects our analysis. We conclude that it does not. Section 904(c) simply enhances the ability of taxpayers to take full advantage of their foreign tax credits by allowing them to apply credits that cannot be used in the year of election to other years within a prescribed range. If, as in Chrysler's case, the taxpayer did not pay enough taxes to the

United States to make full use of its foreign tax credit in the year of election, § 904(c) provides an additional seven-year period to do so. Under those conditions, the Internal Revenue Code allows the taxpayer to "deem" the foreign taxes paid in a year other than the one in which they were actually paid. We see nothing in the language of § 904(c), however, to suggest that the ten-year limitations period of § 6511(d)(3)(A) refers to the year that the foreign tax is "deemed" paid. To the contrary, when read together, the three statutory provisions set forth an unambiguous scheme for claiming and taking foreign tax credits. Section 901(a) requires the taxpayer to elect to take – or decline to take – a foreign tax credit in the year the foreign tax is paid. Section 6511(d)(3)(A) then allows the taxpayer a ten-year period from this initial election to amend its election. Finally, § 904(c) provides a way to increase the likelihood that a taxpayer can take full use of its foreign tax credits by either carrying back or carrying forward unused credits to other tax years. However, it has no effect on the ten-year limitations period, which runs from the tax year that the foreign tax was actually paid and the credit accrued.

Because the statutes at issue may be read "unambiguously and reasonably," *Limited*, 286 F.3d at 332, we need not resort to legislative history. As the Court of Claims has noted, "the normal understanding of the bare language that is entitled to prevail does not necessarily exclude all possibility of an alternative reading that refined and subtle legal analysis might invent." *Hart*, 585 F.2d at 1028 (punctuation altered). Moreover, as *Hart*, *Ampex*, and the parties themselves concede, the legislative history accompanying these statutes is often inconsistent and not overly enlightening. *See, e.g., Hart*, 585 F.2d at 1030.

Before concluding, we will take a moment to mention four considerations that lend additional support to our reading of the statutes. First, we agree with Chrysler that Congress permits the use of foreign tax credits in order to allow taxpayers to avoid double taxation. However, Chrysler did not come away empty-handed because it initially elected not to take foreign tax credits for the years in question; it claimed deductions based upon those foreign taxes and, presumably, there were valid accounting reasons for its choice. That it was dilatory in seeking to amend its returns in order to claim foreign tax credits for the years in dispute does not alter the fact that it received some tax benefit for foreign taxes paid. Second, that Congress passed "clarifying" language to the phrase of § 6511 in dispute – prospectively amending "for the year with respect to which the claim is made" to "for the year in which such taxes were actually paid" – suggests that our reading is correct. *See* footnote 3, *supra.* Third, our reading avoids the uncertainty that would attend Chrysler's interpretation, which could lead to a shorter or longer limitations period depending on the unique fiscal circumstances of the taxpayer.[4] And, fourth, we are obliged to strictly construe statutes that grant a deduction to a taxpayer in favor of the government. *Weingarden*, 825 F.2d at 1029.

For the foregoing reasons, we affirm the judgment of the Tax Court, and hold that the ten-year statute of limitations period of § 6511(d)(3)(A) "begins with the date prescribed by law for filing the return for the year *from which* the excess foreign taxes are carried." *Ampex*, 620 F.2d at 857.

---

[4]As the Court of Claims observed, however, even under our interpretation, the limitations period could be increased to as much as twelve years in which a taxpayer sought to carry back foreign tax credits as provided in § 904(c). *Ampex*, 620 F.2d at 860 n.10.

### III.

### Employee Stock Ownership Plan

The Tax Court framed the third and final issue as follows:

[W]hether Chrysler Corporation may deduct for 1985 amounts it paid to redeem its common stock held in the employee stock ownership trust (ESOT) underlying the Chrysler Empolyee Stock Ownership Plan (ESOP).

*Chrysler Corp. v. Comm'r*, No. 22148-97, 2001 WL 1090239, T.C.M. (RIA) 2001-244 (Sept. 18, 2001).

The facts giving rise to this dispute are relatively straightforward and were summarized by the Tax Court as follows:

Chrysler was faced with an economic crisis in 1979 that resulted in Congress' enacting the [Chrysler Corporation Loan Guarantee Act of 1979 (LGA), Pub. L. 96-185, 93 Stat. 1324 (1980)] on Chrysler's behalf. . . . By way of the LGA, Congress provided Chrysler with up to $1.5 billion in loan guarantees in return for Chrysler's satisfaction of certain conditions.

Two of the conditions required that employees of Chrysler and its subsidiaries and affiliates make at least $587.5 million in wage and benefit concessions and that Chrysler set up an employee stock ownership plan meeting the requirements of both sections 401(a) (qualified deferred compensation plans) and 4975(e)(7) (employee stock ownership plans). Two other conditions required that Chrysler establish the ESOT within the rules of section 401(a) and that Chrysler contribute shares of its common stock to the ESOT over a 4-year period from 1981 through 1984. In each of those 4 years, Chrysler was required to conribute to the ESOT Chrsyler common stock with a value of at least $40.625 million; during that 4-year period, Chrysler was required to contribute to the ESOT a total of at least $162.5 million of its common stock.

. . . .

Pursuant to the LGA, Chrysler established the ESOP effective July 1, 1980, and funded the ESOT by issuing to it new shares of Chrysler common stock during each of the ESOT's fiscal years ended June 30, 1981 through 1984. Pursuant to the terms of the ESOP, employees could participate in the plan if they had: (1) Worked for Chrysler or any of its subsidiaries or affiliates for 9 continuous months at the beginning of the plan year and (2) been affected by the wage and benefit concessions required by the LGA. Chrysler established the ESOP to: (1) Satisfy the LGA's requirement for obtaining the Federal Government's loan guarantees, (2) compensate employees for wage and benefit concessions, and (3) contribute to Chrysler's financial recovery and long-term viability by enhancing employee motivation and increasing productivity.

Chrysler contributed $162.5 million (15,251,891 shares) of its common stock to the ESOT from 1981 through 1984. Chrysler contributed approximately one-fourth of that dollar amount in each of the 4 years and claimed a deduction for the market value of the contributed shares for the years in which the contributions were made. The contributed shares amounted to approximately 22 percent of

Chrysler's outstanding shares at the end of 1980, and the ESOT held the largest single block of Chrysler common stock.

The ESOT's trustee was a commercial bank named Manufacturer's National Bank of Detroit (MNB), and MNB's nominee was Calhoun & Co. Pursuant to the LGA, MNB allocated the stock contributed by Chrysler to the individual accounts of the ESOP participants in equal amounts, provided that the participant had worked 650 hours or more during the plan year. MNB also invested any dividends received on the stock allocated to a participant's account in additional shares of Chrysler common stock. The LGA authorized the participants to vote the shares in their accounts. MNB had to vote the stock for which no directions had been received in the same proportion as the stock as to which directions had been received. The ESOP authorized distributions to employees only in the event of: (1) Death, in which case the proceeds were forwarded to the designated beneficiary, (2) termination of employment, or (3) the ESOP's termination. Chrysler's board of directors had the discretion to terminate the ESOP at any time after June 30, 1984.

In September 1983, while the ESOP was in place, Chrysler renegotiated its collective bargaining contracts with its employees who were members of the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). The renegotiation resulted in a contract extending through October 1985. In 1985, when the collective bargaining contracts were again renegotiated, Chrysler agreed as part of those contracts to terminate the ESOP and to allow the participants either to keep the Chrysler common stock in the ESOT allocated to them or to allow Chrysler to redeem that stock at a per-share price equal to the applicable closing price on the New York Stock Exchange. In December 1985, Chrysler redeemed just over 9.58 million shares of its common stock from the ESOT for a total cost to Chrysler of $426,969,582. The ESOP participants who opted not to sell their stock received over 3.2 million shares of Chrysler common stock from the ESOT.

On its 1985 Federal income tax return, Chrysler claimed a deduction of $327,595,421 associated with its redemption of its common stock from the ESOT. According to Chrysler's computation, the deduction was less than the redemption price so as not to duplicate the tax benefits Chrysler had previously received by way of the tax deductions claimed for the same shares when contributed to the ESOT. The approximate $328 million deduction was not taken for financial accounting purposes. For those purposes, Chrysler reported the redemption as a purchase of treasury stock.

*Chrysler*, 2001 WL 1090239 (citations and footnote omitted).

Chrysler does not dispute any of the statements made by the Tax Court. However, referring to a declaration of its assistant treasurer (and later vice-president) Robert S. Miller, the company avers that the termination of the ESOP was union-driven. Specifically, as part of the collective bargaining negotiations of 1985, the two sides agreed that the ESOP would be liquidated. The company takes the position that the deduction of $327,595,421 that it made in 1985 in relation to the termination of the ESOP was properly characterized as "compensation" and therefore was deductible under 26 U.S.C. § 162(a). In its view, the LGA obliged Chrysler to establish the ESOP as a means of compensating its employees for the wages and benefits that they relinquished in order to satisfy the terms of the LGA. This position is strengthened by the fact that the union requested the liquidation of the ESOP.

Although the Tax Court's rationale with respect to the details of Chrysler's claim will be discussed in conjunction with the arguments of the parties, it provided the following statement of the core issue, which is worth quoting at the outset:

> We must decide whether Chrysler may deduct the costs (redemption price and related expenses) which it incurred to redeem its common stock upon termination of the ESOP. Respondent moves the Court to decide this issue by way of partial summary judgment, arguing that a firmly established body of law holds that a corporation may not deduct the costs which it incurs to redeem its stock. Petitioner objects to respondent's motion. Petitioner asserts that it may deduct its costs as personal service compensation or, alternatively, as a financing expense. Petitioner argues as to its primary assertion that material facts are still in dispute which will establish that Chrysler redeemed its common stock from the ESOT intending to compensate the employees for their personal services. Petitioner argues as to its alternative assertion that material facts are still in dispute which will establish that it redeemed its common stock from the ESOT as a financing expense.
>
> . . . .
>
> An accrual method taxpayer such as Chrysler may deduct an expenditure under section 162(a) only if the expenditure is: (1) An expense, (2) an ordinary expense, (3) a necessary expense, (4) incurred during the taxable year, and (5) made to carry on a trade or business. A necessary expense is an expense that is appropriate or helpful to the development of the taxpayer's business. An ordinary expense is an expense that is "normal, usual, or customary" in the type of business involved. The need for an expenditure to be ordinary serves, in part, to "clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset."
>
> . . . Whether a corporation's redemption of its stock may constitute an ordinary and necessary business expense under section 162 has been considered frequently before. The relevant cases generally begin their analysis with the oft-quoted principle of *United States v. Gilmore*, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963). There, the Supreme Court held that the expense of defending a divorce suit was a nondeductible personal expense, even though the outcome of the divorce would affect the taxpayer's holdings of income-producing property and might affect his business reputation. The Court explained:
>
> > the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether it is deductible or not * * *
>
> . . . .
>
> Thereafter, the Supreme Court applied the origin of the claim test of *United States v. Gilmore, supra,* to two companion cases in which the issue was whether expenses were ordinary or capital. *See United States v. Hilton Hotels Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); *Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). Both cases involved the deductibility of a corporation's costs incurred incident to the appraisal and acquisition of dissenters'

stock. The Court rejected the corporations' claims that the costs were deductible because their "primary purpose" did not directly involve the acquisition of stock. In the *Woodward* case, the Court explained that "A test based upon the taxpayer's 'purpose' in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions." The Court rejected the primary purpose test as "uncertain and difficult" and directed that the issue of whether an expense is ordinary or capital be controlled by the "simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself." *Woodward v. Commissioner*, *supra* at 577.

> . . . .

> Nor are we persuaded by petitioner's endeavor to avoid application of the well-settled law on redemptions by characterizing the full amount of the redemption payments solely . . . as the payment of personal service compensation. The redemption payments at hand were not . . . a substitute for wages. . . . The fact that the redemption payments were not attributable to the personal services of the employees is seen quickly from the fact that Chrysler merely paid the employees for the appreciated value of their stock. The employees did not receive anything of value from the redemption on account of personal services that would entitle Chrysler to deduct a compensation expense with respect thereto. The employees have simply surrendered their Chrysler stock for its value in cash.

*Chrysler*, 2001 WL 1090239, (citations and footnotes omitted).

As with the issues previously discussed, we review the Tax Court's partial grant of summary judgment to the Commissioner *de novo*. *See Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1232 (10th Cir. 1997).

It is undisputed that, as a general rule, "ordinary and necessary" expenses are deductible while capital expenditures are not. 26 U.S.C. §§ 162(a) (ordinary expenses), 263 (capital expenses). As the Court has put it, "If an expense is capital, it cannot be deducted as 'ordinary and necessary,' either as a business expense under § 162 of the Code or as an expense of 'management, conservation, or maintenance' under § 212." *Woodward*, 397 U.S. at 575.

The Tax Court quoted the origin of the claim test adopted by *Gilmore, supra*, and the parties agree that it applies to the issue before us. Chrysler argues that the Tax Court failed to apply the test correctly. The company then refers us to a Ninth Circuit decision that explains the proper approach as follows:

> Characterization of a transaction for taxation is a two step process. The initial step is to discover the origin of the claim from which the tax dispute arose. This attribution determination is critical to proper tax characterization because of the inherently factual nature of taxation. Once a transaction is placed in its proper context, the nature of that transaction becomes discernible, and its tax character may be identified. Thus, the second step, the actual tax characterization, is dependent upon the proper resolution of the preliminary attribution question.

*Keller Street Dev. Co. v. Comm'r*, 688 F.2d 675, 678 (9th Cir. 1982). Chrysler argues that its "claim" is the demand by the union in 1985 that the ESOP be terminated in consideration of wage and benefit concessions and that Chrysler do so by repurchasing its members' shares. *See* Stipulation of Facts #1 – ESOP Issue, August 8, 2000 at ¶ 169. As the company sees it, the origin of the claim in this case cannot be divorced from the clearly compensatory contribution of shares by Chrysler as required by the LGA to offset wage concessions made by its employees.

Chrysler also relies upon facts, especially those contained in the Miller declaration referenced earlier, that the company believes support its view – or at the very least require a trial. These contentions, which it argues the Tax Court overlooked, include testimony that 1) it was foreseeable that the union would terminate the ESOP if Chrysler regained its financial strength; 2) the union preferred cash compensation to ESOP shares; 3) termination of the ESOP put the company closer to its position prior to the enactment of the LGA; and, 4) Chrysler did not financially benefit from the ESOP.

Just as it contends the Tax Court misconstrued the origin of the claim, so, too, Chrysler argues that the court mistook the character of the claim, which it states was "compensation, pure and simple." In support it cites *Wells Fargo & Co. v. Comm'r*, 224 F.3d 874 (8th Cir. 2000), which involved amounts paid to cancel employee stock options in connection with an acquisition. Despite the fact that this would appear to be a capital expense, part of the deduction was allowed on the theory that the origin of the payments was not the acquisition but the employment relationship between the company and the option holders. *Id.* at 887 (explaining distinction between benefit directly related to acquisition, which is typically capitalized, and an indirect relationship between salaries originating from employment relationship and acquisition).

As the Commissioner points out in response, however, the employees here did not receive a premium upon redemption because Chrysler paid the fair market value of its stock. In other words, the ESOP would have received the same amount had it simply sold the shares on the open market. Furthermore, not all employees chose to receive cash in lieu of stock upon the termination of the ESOP. That some employees remained shareholders in essentially the same financial position as before the liquidation of the ESOP highlights the non-compensatory nature of the redemption. Those employees who elected to receive stock distributions had made the same wage and benefit concessions as those receiving cash distributions, but received no part of the amounts that taxpayer now seeks to deduct. If, instead of compensating its employees with ESOP stock, Chrysler had compensated them in cash that they subsequently invested in Chrysler's stock, the company could not deduct the appreciated value of that stock as compensation if it ultimately redeemed the stock.

In *Harder Servs., Inc. v. Comm'r*, 67 T.C. 585 (1976), a corporation redeemed an employee's stock when it terminated him and attempted to deduct the $100,677 redemption cost. The Tax Court refused to allow the amount to be deducted as compensation, rather than as a capital expense, in part because "there is nothing in the record to indicate that  [the employee] would have been paid anything with respect to the termination of his employment had he wished to retain his 22 shares of Harder Tree thereafter." *Id.* at 597.

The Commissioner also distinguishes *Wells Fargo, supra*. He cites with approval the statement from that case, "the ultimate question is whether the expense is directly related to the transaction which provides the long term benefit." *Wells Fargo*, 224 F.3d at 886. According to the Commissioner, the flaw in Chrysler's argument is its attempt to portray its contribution of stock to the ESOP and its later redemption of the stock as one claim. While Chrysler's stock contributions to the ESOP were compensatory in nature, its agreement with the UAW to terminate the ESOP and to redeem the shares of those participating employees who chose to take cash in lieu of shares represented a distinct, non-compensatory transaction that was not compelled by either the LGA or the terms of the ESOP. Thus, the costs incurred were "directly related" to the stock redemption, but only tangentially related to the LGA and to the establishment and funding of the ESOP.

We conclude that the Tax Court correctly characterized the nature of the stock redemption as non-compensatory. Although the redemption may have been "in consideration of wage and benefit concessions," the company deducted the cost of those benefits as they were incurred in the years leading up to the liquidation of the ESOP. At the time of redemption, it simply paid the

employees fair market value for their shares. Under these circumstances, the Tax Court correctly held that Chrysler could not deduct its redemption-related expenses as compensation.

**IV.**

The decision of the Tax Court entered on November 18, 2002, is **affirmed**.